# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HAYDEE ECHEVARRIA, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:15-cv-1840 (VLB) |
| v. | : | |
| | : | September 28, 2017 |
| UTITEC, INC., | : | |
| Defendant. | : | |

## MEMORANDUM OF DECISION
## DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 40] AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 51]

### I.    Introduction

Plaintiff Haydee Echevarria brings this case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., alleging that she was subjected to a hostile work environment and retaliated against for complaining about sexual harassment.  Plaintiff also brings common law claims for negligent and reckless supervision.  Defendant has moved for summary judgment on all of Plaintiff's claims, and Plaintiff has moved for summary judgment on her common law claims.  For the reasons that follow, these motions for summary judgment are DENIED.

### II.    Facts

#### A. Background

Plaintiff began working at Utitec as a temporary employee on April 23, 2013.  [Dkt. No. 52-3 at 37-38, 52-53; Dkt No. 52-4 at 1].  Kara Harlow, Director of Human Resources, hired Plaintiff on a permanent basis on September 30, 2013.  [Dkt. No. 52-3 at 38, 58-60; Dkt. No. 52-4 at 2; Dkt. No 52-5 at 7].  In this position,

she served as Utitec's receptionist and assisted various managerial employees as needed.  [Dkt. No. 52-3 at 58-60].  In or about mid-July 2014, Plaintiff began to support Samuel Oakes, Director of Engineering, and Yared Mengistu, Director of Quality Assurance.  [Dkt. No. 52-3 at 66-67, 70; Dkt. No 52-5 at 8, 32, 48; Dkt. No. 52-6 at 13-15].  According to Oakes, Plaintiff did a good job for him and he liked her as an employee.  [Dkt. No. 52-6 at 15].  He also described the Plaintiff as a social person who socialized with "everybody" in the office.  *Id.* at 15.  Mengistu was also satisfied with Plaintiff's work performance, enjoyed working with her, and described Plaintiff's mood as "generally positive."  [Dkt. No. 52-23 ¶ 5].

### B.  Plaintiff's Relationship with Arthur Dostaler

Arthur Dostaler is an eyelet toolmaker at Utitec, which is not a supervisory position.  [Dkt. No. 52-3 at 171; Dkt. No. 52-8 at 12, 14-15; Dkt. No. 52-7 at 36; Dkt. No. 52-18 ¶ 1].  Plaintiff met Dostaler in April 2013, and agreed that their first meeting was "innocuous and uneventful."  [Dkt. No. 52-3 at 100-101].  She further described their relationship as initially involving only the exchange of pleasantries such as "hi" and "bye."  *Id.* at 100-101.  However at some point "a couple of months" before a July 17, 2014 Happy Hour, Dostaler began "float[ing] by" her desk to speak to her about his personal life, work complaints, and Plaintiff's appearance.  *Id.* at 101-102.  Plaintiff testified that Dostaler's work complaints seemed "angry," and that she sometimes felt uncomfortable when Dostaler made comments about her appearance.  *Id.* at 111-12.  Plaintiff testified that Dostaler came across as "arrogant and slimy," and would look at her in an

"uncomfortable" or "dirty" way when he commented on her clothing and lipstick. *Id.* at 112-14.

Oakes similarly described Dostaler as having "a quick temper sometimes" and being "loud." [Dkt. No. 56-6 at 21]. Oakes also described Dostaler as "touchy" or "handsy." [Dkt. No. 52-6 at 56-57]. While he believed he had seen Dostaler touch multiple female employees, including giving shoulder rubs to "several women," he could only specifically remember the name of one woman who Dostaler gave a shoulder rub, but who asked Dostaler to do so. *Id.* at 58-59. Oakes did not know whether any other touches or shoulder rubs he witnessed were or were not welcome, but testified that he "wouldn't touch the people [he] work[ed] with" and that it made him "uncomfortable." *Id.* at 57-58; [Dkt. No. 56-22 ¶¶ 4-5]. Oakes did not report any of these incidents to Human Resources. [*See* Dkt. No 52-5 at 75-77, Dkt. 52-25 ¶ 6].

At Plaintiff's request, Dostaler stopped making comments about Plaintiff's clothing and lipstick. [Dkt. No. 52-3 at 101, 115-18, 119]. However, Plaintiff testified that Dostaler continued giving her "I-want-you-looks" or "I-want-to-have-sex-with-you" looks. *Id.* at 117-19. Dostaler denies making inappropriate comments or giving inappropriate looks. [Dkt. No. 52-18 ¶ 2, 7]. Plaintiff testified that she did not think she reported any of these alleged comments or looks to her supervisors or human resources. [Dkt. No 52-3 at 119].

C. <u>Happy Hour</u>

On Thursday, July 17, 2014, approximately ten Utitec employees, including the Plaintiff, Dostaler, Oakes, and Mengistu, went to a "happy hour" at Prime

3

Time Pub in Thomaston, Connecticut.  To Plaintiff's knowledge, no supervisors or representatives of human resources other than Oakes and Mengistu attended.  *Id.* at 119-20, 128; [Dkt. No. 52-8 at 47-48; Dkt. No 52-5 at 73; Dkt. No. 52-9 at 7, 22; Dkt. No. 52-11 at 10, 28-29; Dkt. No. 52-7 at 69-70].  Plaintiff was not required to attend the happy hour, she was not paid for her time there, and she was unaware of any business that may have been conducted there.  [Dkt. No. 52-3 at 124-26]. However, the happy hour was planned at the office by two of her co-workers, who spread invitations by talking to other employees in the office.  *Id.* at 121-23.

During the happy hour, Dostaler approached the Plaintiff on three or four separate occasions.  She alleges that he tried to feed her food and asked what time she was leaving, whether her husband was home, whether he husband knew she was at the Prime Time Pub, why she did not let her hair down, and why she seemed uptight.  *Id.* at 133, 135-36.  In response, Plaintiff told Dostaler, "No, thank you.  Get away from me.  I'm good."  *Id.* at 136-38.  Oakes described Dostaler's conduct as "pestering" and "very irritating."  [Dkt. No. 52-6 at 36-39].  He testified that he observed Dostaler try to feed the Plaintiff food and ask her questions about where she was going after the Happy Hour, if she was going home to her husband, and if she was going to be cooking.  *Id.* at 36-39.  Dostaler denied trying to feed the Plaintiff food, and said that when he said "[w]hy don't you let your hair down," he meant, "why don't you relax and have a good time."  [Dkt. No. 52-8 at 49-51; Dkt. No. 52-18 ¶ 8].  Plaintiff asked Oakes to walk her to her car around 7:00 p.m., which he did.  [Dkt. No. 52-3 at 155; Dkt. No. 52-6 at 40].  Although she did not say so, Oakes believed Plaintiff asked for his escort because she was

uncomfortable. [Dkt. No. 52-6 at 40]. On the morning following the happy hour, Dostaler "lurked" near Plaintiff's area and told her he was disappointed she had not let her hair down or let loose the night before. [Dkt. No. 52-3 at 157-58, 174-79; Dkt. No. 52-6 at 47].

### D. Human Resources Report and Responses

Plaintiff initially wanted to handle the incidents with Dostaler herself and therefore did not immediately report them to Human Resources. [Dkt. No. 52-3 at 168; Dkt. No. 52-6 at 74-75]. Plaintiff admitted at her deposition that it is possible she asked Oakes not to report to Harlow what had happened at the happy hour and the following day. [Dkt. No. 52-3 at 193-94].

Despite Plaintiff's reluctance to report the incident, at some point between July 18, 2014 and August 6, 2014, Oakes did share concerns about Dostaler's behavior at the happy hour with Robert Oppici, Utitec's President and Chief Executive Officer, which he shared with Harlow, who in turn spoke to Oakes. [Dkt. No. 52-5 at 74, 77; Dkt. No. 52-6 at 7, 44-46; Dkt. No. 52-9 at 24-25]. Harlow decided not to open a formal investigation into Oakes' observations from the happy hour because the alleged conduct had not occurred at a work event or during work hours. [Dkt. No. 56-5 at 77; Dkt. No. 56-25 ¶¶ 3-4]. Harlow and Oppici testified that she had never heard or observed anything about Dostaler's conduct or behavior that caused her concern, and that she had not received any complaints about Dostaler. [Dkt. No 52-5 at 75-77; Dkt. No. 52-9 at 7, 29; Dkt. 52-25 ¶ 6].

Utitec has an Anti-Harassment and Non-Discrimination Policy and a Reporting Process Policy that are set forth in the employee handbook, and which are shared with all employees when they join Utitec. [Dkt. No. 52-5 at 66; Dkt. No. 52-25 ¶ 7; Dkt. No. 52-26 at BATES000321-322]. The handbook requires supervisors to report all suspected acts of harassment or discrimination. [Dkt. No. 47-1 at 8]. It also provides that "[t]he Company will promptly and thoroughly investigate all complaints and will take appropriate action, up to and including termination of employment, if the circumstances warrant." *Id*. Plaintiff was given a copy of the handbook that describes these policies. [Dkt. No. 52-5 at 66; Dkt. No. 52-25 ¶ 7].

Harlow conducted a sexual harassment training class for Utitec supervisors on August 6, 2014. [Dkt. No. 52-5 at 49-50; Dkt. No. 52-25 ¶8]. Plaintiff testified that she attended the training because she believed it would be "informative," but that she was not asked or required to attend. [Dkt. No 52-3 at 180-83]. Plaintiff testified that during the training, Harlow stated that it was her understanding that something had happened at the Happy Hour and if the person who had an issue did not come forward, the supervisors who attended the Happy Hour could be fired for not reporting the incident. *Id.* at 185. Harlow denies making this statement and counters that at most, she noted that supervisors have a responsibility to report sexual harassment that they observe or about which they are informed. [Dkt. No. 53-5 at 125-26; Dkt. No. 53-25 ¶ 8].

Plaintiff formally reported her concerns about Dostaler to Harlow on August 15, 2014, at least in part because she believed Oakes and Mengistu would

be fired if she failed to do so.  [Dkt. No. 52-3 at 195].  Plaintiff testified that she told Harlow, "You already know why I'm here" and that she was sorry she had not come to her sooner, but that she did not want to be a burden to Harlow and she was trying to take care of the problem herself.  *Id.* at 199-200.  Following this conversation, Harlow decided to issue Dostaler a written reprimand.  [Dkt. No. 52-5 at 84-85, 87; Dkt. No. 52-25 ¶ 10; Dkt. No. 52-28].

### E. Alleged Unwanted Touching and Reprimand

Dostaler was to be given this reprimand at a meeting with his supervisors on the morning of Monday, August 18, 2014.  [Dkt. No. 52-9 at 39-40; Dkt. No. 52-20 ¶ 3].  However, at some point it was decided that the meeting should wait until the end of Dostaler's shift, so that he could go home immediately afterward.  [Dkt. No. 52-9 at 39-40; Dkt. No. 52-20 ¶ 3].  Plaintiff alleges that on the morning of August 18, 2014, Dostaler came up behind her and "swiped three to four finders on the back of [her] neck down to . . . the very top of where the buttocks would begin."  [Dkt. No. 52-3 at 213-14, 222-23].  Defendant disputes that Dostaler touched the Plaintiff anywhere lower than her "mid-back."  [Dkt. No 52-5 at 107-08, Dkt. No. 52-6 at 66; Dkt. No. 52-9 at 41-42; Dkt. No. 52-11 at 54, 59].  Immediately after Dostaler ran his fingers down Plaintiff's back, Plaintiff "took off."  [Dkt. No. 52-3 at 223-24].  Dostaler followed behind her and grabbed her hand for a couple of seconds before she jerked it away.  *Id.*

Plaintiff reported the incident to Oppici.  *Id.* at 224-25.  Both plaintiff and Oppici erroneously believed that Dostaler received his reprimand before he touched the Plaintiff.  *Id.* at 224-26; [Dkt. No. 52-9 at 41, 43].  In an email about the

incident, Oppici wrote, "As you know, Art was going to be spoken to about his unprofessional conduct . . . first thing this morning . . . . To my surprise and unbeknown to me, it was decided to speak to Art at the end of the day rather than first thing in the morning as it might affect Art's work day, etc. Well that decision backfired." [Dkt. No. 61-2 at BATES000878]. Oakes testified that the Plaintiff also reported the incident to him and that at the time she was "hysterical." [Dkt. No. 52-6 at 65-67]. Plaintiff left work early on August 18, 2014 and took August 19, 2014 off as a result of this incident. *Id.* at 72-73; [Dkt. No. 52-3 at 231, 244-45; Dkt. No. 52-25 ¶ 16].

After learning of the incident, it was determined that Goad and McGregor would read Dostaler the written reprimand immediately after lunch instead of at the end of his shift. [Dkt. No. 52-8 at 68]. Dostaler admitted touching Plaintiff's back but testified that he denied any wrongdoing and refused to sign the reprimand. *Id.* at 69, 72. He also testified that he was told any similar conduct in the future would result in his termination, and was instructed to go to sexual harassment training. *Id.* Plaintiffs dispute that Dostaler was instructed to attend sexual harassment training, but offer no evidence that the written reprimand, which includes this instruction, and which the Dostaler testified he was read, was inaccurate. *Id.* at 67-68; [Dkt. 52-28].

On Wednesday, August 20, 2014, Plaintiff returned to work and met with Contadini and Oppici. [Dkt. No. 52-9 at 57-58; Dkt. No. 52-3 at 250]. Plaintiff testified that Contadini apologized for Dostaler's behavior and told her that Dostaler had been spoken to and was told to stay away from her. [Dkt. No. 52-3 at

252-53].  She also testified that Oppici said something along the lines of, "These things sometimes happen, and sometimes they're misread, and sometimes we shouldn't think anything of them."  [Dkt. No. 52-3 at 253].  Contadini also told her that if anything happened in the future, she should report it to Contadini or Oppici.  [Dkt. No. 52-3 at 253].

The parties disagree about the course of events following Dostaler's reprimand.  Harlow testified that on Tuesday, August 26, 2014, she met with the Plaintiff, who told her that she was okay, except that every time Dostaler walked by her workstation to use the bathroom, he would look at her.  [Dkt. No. 52-5 at 113-115; Dkt. No. 52-25 ¶ 11; Dkt. No. 52-29 at BATES000189].  Harlow testified that thereafter she reminded Dostaler to stay away from the Plaintiff.  [Dkt. No. 52-5 at 113-115; Dkt. No. 52-25 ¶ 11; Dkt. No. 52-29 at BATES000189].  Harlow also testified that she asked the Plaintiff a couple of time if Dostaler was leaving her alone and that Plaintiff said yes.  [Dkt. No. 52-5 at 118].  Plaintiff did not recall any of these conversations taking place.  [Dkt. No. 52-3 at 263].  Similarly, Dostaler testified that he asked co-workers to be present if he was ever in the same room with the Plaintiff, and that he made an effort to stay away from her.  [Dkt. 52-8 at 88, 98].

F.  Subsequent Incidents

Plaintiff maintains that in September or October 2014, Dostaler walked closely behind her, brushed her shoulder, and said something in a grunting tone.  [Dkt. No 52-3 at 260-61].  She reported this to Harlow, who allegedly told her that "she couldn't very well talk to everyone that made grunting sounds."  *Id.* at 262.

Additionally, she alleges that in October 2014, she and Dostaler were walking down the same corridor in opposite directions and Dostaler "pushed into [her] shoulder" as he walked past her. [Dkt. No. 52-6 at 270-71]. Plaintiff also became worried when Dostaler would be nearby and would look at her in a way that made her feel uncomfortable. *Id.* at 92-93. Plaintiff did not report these incidents to Harlow, but she did report concerns about Dostaler's proximity and looks to Oakes. *Id.* at 52-53, 92-93; [Dkt. No. 52-3 at 271]. Dostaler denies that these interactions took place. [Dkt. No. 52-8 at 80; Dkt. No. 52-18 ¶ 7].

### G. Workstation Move

In or about September or October 2014, Plaintiff's workstation was moved from the reception desk in the front office to the engineering department so that she would sit closer to her supervisors. [Dkt. No. 52-3 at 72-73; Dkt. No. 52-5 at 48-49, 226; Dkt. No. 52-23 ¶ 4]. Although Plaintiff testified that the move made her job easier, she attributed this to the fact that she was no longer required to perform receptionist duties following her move, and that she was able to work from other computers in the office if hers did not work. [Dkt. No. 72-73, 81-82].

Beginning November 2014, Utitec underwent a renovation that required a change of seating arrangements for many employees, including the Plaintiff. [Dkt. No. 52-3 at 267-68; Dkt. No. 52-5 at 144-45; Dkt. No. 52-6 at 83]. Plaintiff's department was not scheduled to begin its move until February 2015, and Defendant maintains that it wanted temporarily to move the Plaintiff's workstation to a location in the quality assurance department so that she could be near Mengistu. [Dkt. No. 56-5 at 172-73; Dkt. No. 52-25 ¶ 34; Dkt. No. 52-23 ¶ 16].

Plaintiff objected to this move because it would place her desk near Dostaler's workspace. [Dkt. No. 52-3 at 263-65]. In response, Harlow told the Plaintiff that if she did not want her workspace in its proposed location she was "more than welcome to transfer to another administrative position within the company, where you would be sitting in the front office area." [Dkt. No. 52-16]. The parties dispute whether this other position was equivalent. Defendant claims that it was a promotion because it would have provided her the opportunity to earn a commission in addition to her base pay rate. [Dkt. No. 52-25 ¶ 39]. Plaintiff counters that the position provided less opportunity for advancement or professional growth and would involve fewer substantive responsibilities. [Dkt. No. 62-2 ¶ 19].

### H. Medical Leave

Plaintiff took a substantial amount of medical leave between October 1, 2014 and March 6, 2015, working only 37 days during this period. [Dkt. No. 52-25 ¶ 24; Dkt. No. 52-31 at BATES00062-65]. Plaintiff's last day of work was March 9, 2015, and the Plaintiff went on long term disability on or about April 29, 2015. [Dkt. No. 52-3 at 282, 285; Dkt. No. 52-25 ¶¶ 23, 27-28]. During her extended medical leave, Harlow sent Plaintiff a letter and an email indicating that Plaintiff would be terminated if she did not return to work before August 12, 2015, and Plaintiff did not return to work on that date. [Dkt. No. 52-25 ¶¶ 29-31; Dkt. No. 52-37]. Plaintiff attributes some of her medical problems and her inability to return to work in March 2015 to distress Dostaler caused, and her fear of being required

to sit at a workspace where she would be unable to avoid Dostaler.  [Dkt. No. 62-2 ¶ 18].

   III.   <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted).  In addition, "the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury."  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without

evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir. 1996)). "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 251).

## IV. <u>Discussion</u>

### A. <u>Hostile Work Environment</u>

Pursuant to Title VII of the Civil Rights Act of 1964, "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "[S]exual harassment so 'severe or pervasive' as to 'alter the conditions of . . . employment and create an abusive working environment' violates Title VII." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).

To prevail on a hostile work environment claim, a plaintiff must demonstrate: (1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Id.* At issue on summary judgment is whether the conduct at issue is objectively offensive and whether this conduct can be imputed to Utitec.

13

### 1.  The Alleged Harassment is Sufficiently Severe and Pervasive

To be actionable, allegedly harassing conduct "must be severe [or] pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'"  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)); see also *Redd v. New York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) ("[A] plaintiff need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions.").  Additionally, the "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787.

"[A] work environment's hostility should be assessed based on the totality of the circumstances."  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quotations omitted) (citing *Harris*, 510 U.S. at 22).  "Factors that a court might consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) 'whether it unreasonably interferes with an employee's work performance.'"  *Id.*  "The Second Circuit has consistently 'cautioned against setting the bar [for a hostile work environment claim] too high, noting that while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or

quantity that a reasonable employee would find the conditions of his employment altered for the worse.'" *Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 186 (E.D.N.Y. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

While "incidents of harassment must be more than episodic," *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002), "[t]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim," *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000). "[A] single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano*, 294 F.3d at 374. "Physical contact that might be expected among friends—a hand on the shoulder, a brief hug, or a peck on the cheek—would normally be unlikely to create a hostile environment." *Redd v. New York Div. of Parole*, 678 F.3d 166, 177 (2d Cir. 2012). However, this ceases to be the case when there are "aggravating circumstances such as continued contact after an objection." *Id.* "Direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment." *Id.* at 180.

Defendant argues that the alleged harassment is not objectively severe or pervasive because the relevant incidents were "few and far between, and occurred sporadically." [Dkt. No. 51-1 at 17]. It similarly characterizes the physical touching involved—Dostaler attempting to feed the Plaintiff, running his fingers from her neck to the top of her buttocks and grabbing her hand when she tried to escape and brushing against her and grunting—as "relatively minimal

and unobtrusive." [Dkt. No. 51-1 at 19]. The Court disagrees. Plaintiff describes conduct that became progressively more invasive, progressing from comments to touching the Plaintiff with an object (food), to touching the Plaintiff with his own body. A reasonable jury could readily conclude that these incidents constituted an unwanted invasion of Plaintiff's physical space of a highly personal and intimidating nature.

### 2. The Alleged Harassment Can Be Imputed To Utitec

Where a hostile work environment is created by a co-worker, rather than a supervisor, "'the employer will be held liable only for its own negligence,' and the plaintiff must demonstrate that the employer 'failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)). "In determining the appropriateness of an employer's response, we look to whether the response was 'immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility [the employer] has with respect to [the employee's] behavior.'" *Id.* (quoting *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111 (8th Cir. 1997)).

Citing *Devlin v. Teachers' Ins. & Annuity Ass'n of Am.*, No. 02 CIV. 3228 (JSR), 2003 WL 1738969, at *2 (S.D.N.Y. Apr. 2, 2003), Defendant argues that it cannot be held responsible for Dostaler's conduct at the happy hour because it was between co-workers, and happened after work hours, off-site, and at a non-

company event.  [Dkt. No. 51-1 at 24].  Like the instant case, Devlin involved an incident of harassment that took place at a bar among a group of co-workers, during an event that had been organized at work, but was not sponsored by the plaintiff's employer.  *See id.* at *1.  *Devlin* is distinguishable, however, because the only instance of harassment at issue took place during the event, and because the employer's response to the harassment was to "demote[] [the perpetrator], cut his pay and prohibit[] him from entering the floor where [the plaintiff] worked."  *See id*.  Here, alleged harassment at an informal post-work event was reported by a supervisor, but no formal action was taken until several weeks later, when the Plaintiff filed a separate complaint.  As a consequence, Dostaler was free to later make comments about the happy hour that made the Plaintiff uncomfortable, and to escalate his behavior by touching the Plaintiff in an unwanted and offensive manner.

Moreover, "[t]he court is aware of no settled law that, in gauging the severity or pervasiveness and effects of sexual harassment, allows the offender to compartmentalize his misconduct . . . in other words, to allow a harasser to pick and choose the venue for his assaults so as to not account for those that occur physically outside the workplace."  *Parrish v. Sollecito*, 249 F. Supp. 2d 342, 350-51 (S.D.N.Y. 2003).  A "practical or constructive extension of the work environment" is often necessary because an "offender's license to engage in sexual misconduct towards a co-worker outside the company may derive and draw comfort from his understanding of what is permissible behavior in the workplace or his perception of how far he can push the limits and what

discriminatory wrongs against a fellow employee he can inflict with impunity." *Id.* at 351–52. This is particularly true where, as here, harassing conduct occurred during an event planned and attended by a sizable group of co-workers, including two supervisors.

Defendant next argues that its failure to speak with Dostaler about his behavior at the happy hour was appropriate because the Plaintiff asked Oakes to keep her complaint confidential. In support they cite *Torres v. Pisano*, 116 F.3d 625, 639 (2d Cir. 1997). In that case, the court noted that "the law will not presume in every case that harassed members of Title VII's protected classes do not know what is best for themselves and cannot make reasonable decisions to delay—at least for a time—pursuing harassment claims, perhaps for privacy or emotional reasons, until they are ready to do so." *Id.* The court emphasized that the supervisor had been placed in a "difficult situation" in which disclosing the plaintiff's complaint would have "breached her trust." *Id.* The court then held that a supervisor does not necessarily breach his duty to an employee who asks for confidentiality by failing to take action, unless there is, for example, evidence of "serious physical or psychological harm that would have occurred if the employer did not act forthwith" or in the case where "a supervisor or co-worker is harassing a number of employees, and one employee asks the company not to take action." *Id.*

The instant case is distinguishable. First, Oakes ultimately did disclose Dostaler's conduct to human resources, so any trust that the plaintiff placed in him to keep the incident confidential had already been breached. Second, there

is no evidence that the employer in *Torres* had a mandatory reporting policy for supervisors, as is the case here. Third, at least one other supervisor was present at the happy hour to witness both Dostaler's conduct and Echevarria's objections to that conduct, as were several other co-workers. Therefore, the other employees present at the happy hour would have known the substance of any information that Echevarria might have shared with Oakes. *Torres* does not stand for the proposition that an employer may do nothing when harassment is widely known to management.

B. Retaliation

Title VII makes it unlawful for employers to retaliate against employees who oppose employment discrimination, or submit or support a complaint of employment discrimination. *See* 42 U.S.C. § 2000e-3(a); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2532 (2013). Retaliation claims are evaluated using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996). "Under this framework, a plaintiff must first establish a *prima facie* case of discrimination." *Ruiz v. Cnty of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (citation omitted). The plaintiff's *prima facie* burden is "'*de minimis,*' and 'the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

"If the plaintiff sustains this initial burden, 'a presumption of retaliation arises.' The defendant must then 'articulate a legitimate, non-retaliatory reason for the adverse employment action.'" *Id.* If the Defendant offers a legitimate non-discriminatory reason for the employment action "the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* "A plaintiff can sustain this burden by proving that 'a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse action].'" *Id.* (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

"[T]he Second Circuit has observed that under the *McDonnell Douglass* framework, setting forth a prima facie case for retaliation 'tend[s] to collapse as a practical matter' into analysis of the later requirement that the plaintiff show the legitimate reason to be mere pretext." *Blackwell v. City of Bridgeport*, 238 F. Supp. 3d 296, 310 (D. Conn. 2017) (citation and quotations omitted) (quoting *Collins v. N.Y. City Transit Auth.*, 305 F.3d 113, 119 n.1 (2d Cir. 2002)). "[A] plaintiff may rely on evidence comprising her prima facie case . . . together with other evidence such as inconsistent employer explanations, to defeat summary judgment" at the pretext stage. *See also Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013).

To establish a *prima facie* case of unlawful retaliation under Title VII, "an employee must show that (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially

adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)).

At issue is whether Plaintiff was subject to an adverse action, and whether there is any causal connection between her complaints and this adverse action. A materially adverse action is one that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006). "'[T]here are no bright-line rules' with respect to what constitutes an adverse employment action for purposes of a retaliation claim, and therefore 'courts must pore over each case to determine whether the challenged employment action reaches the level of adverse.'" *Fincher*, 604 F.3d at 721 (quoting *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997)). Causation "can be shown indirectly by timing:  protected activity followed closely in time by adverse employment action." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015).

1. Workstation Move

Plaintiff first argues that Defendants retaliated against her by reassigning her to a workspace close to her harasser.  Defendant argues that the move was required to accommodate planned renovations, and that because the Plaintiff never actually moved to a new workstation, no adverse employment action took place.  More specifically, Defendant argues that a *threatened* workstation move

does not constitute an adverse employment action. Defendant cites *Durkin v. Verizon New York, Inc.*, 678 F. Supp. 2d 124, 139 (S.D.N.Y. 2009) and *Thomas v. Bergdorf Goodman, Inc.*, No 03-CIV-124, 139 (S.D.N.Y. 2004) for the principle that "an action must actually occur to be considered an adverse employment action," and that the "mere threat of disciplinary action, including the threat of termination, does not constitute an adverse action materially altering the conditions of employment." [*See* Dkt. No. 51-1 at 31]. However, this "mere threat" language is inconsistent with the standard for an adverse employment action set forth in *Burlington*, and with more recent Second Circuit precedent. *See Burlington*, 548 U.S. at 68 (holding that "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment" and that an action is materially adverse if it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." (quotation omitted)); *Rivera*, 743 F.3d at 26 (holding that a "reasonable juror could find both that [a supervisor] threatened [the plaintiff] with the loss of his job, and that this threat would dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.").

The Supreme Court chose the "dissuade a reasonable worker" standard because "the significance of any given act of retaliation will often depend upon the particular circumstances." *Burlington*, 548 U.S. at 69. This Court must therefore consider the effect of the proposed workstation move on the motivations of a reasonable employee in Plaintiff's situation. Plaintiff has offered evidence that the Defendant offered her two choices: she could either sit at a

workstation that might bring her in close contact with her harasser, or she could accept a new position that would allow her to sit further away from him. The Court must consider whether being forced to sit near a harasser would deter an employee from complaining, whether any legitimate business need required Plaintiff to sit in the proposed new location to do her original job, and whether the proposed alternative position was equivalent to the Plaintiff's.

A reasonable woman whose co-worker has subjected her to an unwanted invasion of her personal space, as Plaintiff alleges, could certainly want to limit her interaction with her harasser, and might refrain from making a formal complaint of discrimination if she believed doing so would result in being forced to work in close proximity to him.

Defendants offer some evidence that legitimate business need required plaintiff's workspace to be near that of her supervisor. For example, Plaintiff testified that her job became "easier" when she moved away from the reception area and closer to her supervisors. However, a reasonable interpretation of her full testimony was that her job became easier when she was no longer required to perform the responsibilities of a receptionist and had access to alternate computers when her computer was not working. Moreover, the Defendant has not offered evidence that alternative locations within the office were unavailable.

While Defendant offered Plaintiff an opportunity to transfer to a new position, there is insufficient evidence in the record to determine as a matter of law that this new position was equivalent to Plaintiff's position. Defendant offers evidence that both positions had the same base salary, but that the new position

could allow Plaintiff to earn additional income from commissions.  This suggests that the new position might be more desirable than Plaintiff's original position.  However, the record includes no evidence regarding how these commissions are earned or the likelihood that Plaintiff would actually earn them.  Similarly, while both positions are administrative in nature, the administrative assistant to the director of engineering or quality assurance could, as Plaintiff alleges, have more substantive responsibilities and greater opportunities for advancement than an administrative assistant in a different department.  Because a reasonable employee could want to avoid contact with her harasser, and could find the proposed alternative position less desirable, Defendant's threatened workstation move could deter a reasonable employee from filing a complaint of discrimination.  These material factual disputes regarding the need for Plaintiff's workspace to be located close to her supervisors, the availability of other workspaces within the office, and the desirability of the alternative position, preclude summary judgment regarding whether the threatened workstation move was an adverse employment action.

Defendant next argues that there is no causal nexus between Plaintiff's complaints and the workstation move, because her last formal complaint was made in November 2014, and she was not notified of the move until February 2015.  "The case law in the Second Circuit is unclear with regard to how much time can pass between a protected action and the adverse employment action before no causal connection can be inferred, but the Second Circuit has emphasized that it has not 'drawn a bright line to define the outer limits beyond

which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.'" *McCall v. Genpak, LLC*, No. 13-CV-1947 KMK, 2015 WL 5730352, at *22 (S.D.N.Y. Sept. 30, 2015). The three to four month gap present here is has been held sufficient to support an inference of causation. *See id.* ("While some courts have held that three months is too long to draw a causal inference based on the temporal relationship, others have held that fact finders could draw temporal inferences from gaps between protected action and adverse employment actions of three months or, indeed, much longer."); *see also, e.g.*, *Feliciano v. Alpha Sector, Inc.*, No. 00 CIV. 9309 (AGS), 2002 WL 1492139, at *12 (S.D.N.Y. July 12, 2002) (holding that lapse of two months was insufficient to show causation, but stating that "this time lag is not dispositive of the issue"); *Kanhoye v. Altana Inc.*, 686 F. Supp. 2d 199, 209 (E.D.N.Y. 2009) (holding that an adverse action that took place between "two and three months after the complaints [was] a sufficiently short gap to permit a reasonable inference of retaliation at the *prima facie* stage"). Particularly since the Plaintiff was on extended medical leaves during the period in question, the Court is reluctant to conclude that the time lapse present in this case would necessarily prevent a reasonable jury from finding causation.

2. <u>Failure to Investigate Complaints</u>

Plaintiff also argues that Defendant retaliated against her by failing to investigate her harassment complaints. "[A]n employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action

taken in retaliation for the filing of the same discrimination complaint." *Fincher*, 604 F.3d at 721. Plaintiff therefore cannot show that Utitec's failure to investigate the happy hour incident was retaliation. However, Plaintiff does identify two other alleged instances of harassment that took place within a couple of months of her initial complaint: (1) she reported that she believed Dostaler was intentionally coming to her work area; and (2) she reported that Dostaler brushed against her and grunted. Neither of these instances was investigated, and in one case, record evidence suggests that Harlow's response was to tell the Plaintiff that "she couldn't very well talk to everyone that made grunting sounds." [Dkt. No. 52-3 at 262]. The knowledge that her subsequent complaints were falling on deaf ears could easily dissuade a reasonable employee from continuing to report harassment, and can therefore constitute an adverse action. *See Delisi v. Nat'l Ass'n of Prof'l Women, Inc.*, 48 F. Supp. 3d 492, 497 (E.D.N.Y. 2014) (holding that the case was distinguishable from *Fincher* because it involved the failure to investigate a subsequent complaint of discrimination).

Defendant argues that that it could not have known that Plaintiff's complaint about Dostaler's "grunting," brushing against her, or unnecessarily coming to her work space was a protected activity. However, when considered with the Plaintiff's previous complaints, in which the Plaintiff reported that Dostaler subjected the her to unwanted touching because of her sex, it is difficult to believe that Defendant would not have known that when the Plaintiff complained of further physical contact and "grunting" she did not believe that these actions were a form of sexual harassment. Defendant therefore fails to

offer a legitimate, non-retaliatory reason for failing to investigate her subsequent complaints.

C. <u>Negligent and Reckless Supervision</u>

Both Plaintiff and Defendant have moved for summary judgment on Plaintiff's negligent and reckless supervision claims. As "[t]he difference between negligence and recklessness is one of degree" and "[t]he facts relevant to both claims are categorically the same," *Echevarria v. Utitec, Inc.*, No. 3:15-CV-1840 (VLB), 2017 WL 1042060, at *3 (D. Conn. Mar. 17, 2017), the Court considers the claims together.

"A negligent supervision claim requires a plaintiff to plead and prove that she suffered an injury 'due to the defendant's failure to supervise an employee whom the defendant had a duty to supervise.'" *Miller v. Ethan Allen Glob., Inc.*, No. 3:10-CV-1701 JCH, 2011 WL 3704806, at *11 (D. Conn. Aug. 23, 2011) (quoting *Abate v. Circuit–Wise, Inc.*, 130 F. Supp. 2d 341, 344 (D. Conn. 2001)). "In order to state a claim, a plaintiff must allege that a defendant knew or should have known of another employee's propensity to engage in the alleged tortious behavior." *Shanks v. Walker*, 116 F. Supp. 2d 311, 314 (D. Conn. 2000).

In general, to establish that conduct was reckless, a plaintiff must prove conduct that is "more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them . . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action . . . [and it] tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is

apparent." *Elliott v. City of Waterbury*, 245 Conn. 385, 415 (1998). The bounds of "reckless supervision" have not been clearly defined in the employment context, but have been described as "supervision of an employee with reckless indifference or disregard of the rights of others," *Dewey v. Gosselin*, No. CV 970571659S, 1997 WL 584710, at *2 (Conn. Super. Ct. Sept. 10, 1997), or the knowing "disregard of foreseeable dangers," *Ramirez v. Dietrich*, No. CV146024621S, 2017 WL 1194288, at *4 (Conn. Super. Ct. Mar. 3, 2017).

Plaintiff claims that Defendant was reckless and negligent when it failed to take remedial action against Dostaler prior to the happy hour, given that Oakes had observed Dostaler being "handsy" or "touchy" with female employees. She argues that this failure gave Dostaler license to assault her during the happy hour by attempting to force feed her food and making uncomfortable comments about her husband and her behavior at the happy hour. Material issues of fact exist with respect to Utitec's knowledge of Dostaler's propensity to harass the Plaintiff or other female employees prior to the happy hour. For example, the import of Oakes' observation that Dostaler had been "handsy" with female employees is moderated by the fact that Oakes was only able to identify one employee other than the Plaintiff whom Dostaler had touched in the workplace, and that other employee denied that the touching in question was unwanted. Whether Oakes was in fact more sensitive to touching in the workplace than was reasonable is also a question best resolved by a jury.

Plaintiff next claims that Defendant was reckless and negligent by failing to take any remedial action immediately after the happy hour, because Oakes was

present to witness Dostaler's behavior, and he reported his observations to human resources. Plaintiff alleges that this failure resulted in an assault and battery on August 18, 2014. Material issues of fact also preclude summary judgment on this issue. First, the parties dispute the severity and impropriety of Dostaler's conduct at the Happy Hour and in the office on August 18, 2014. For example, Dostaler denies attempting to feed the Plaintiff and denies that any of his comments were of a romantic or sexual nature, and he describes the August 18, 2014 incident as involving a light touch on the shoulder, which a jury could conclude would have been neither harmful nor offensive to a reasonable person, although it is unlikely because of the prior intrusive behavior and Dostaler's reprimand. By contrast, Plaintiff describes a deliberate and unwanted caress from neck to buttocks, which a reasonable jury could find highly offensive. Second, material issues of fact exist with respect to management's intent after receiving Oakes' complaint. A reasonable jury could conclude that that Harlow's decision not to conduct an investigation or discipline Dostaler after receiving Oakes' complaint was either unreasonable in light of his demonstration of a propensity to harass the plaintiff, or displayed a conscious disregard for the risk that Dostaler would harass her again.

The Court is not convinced, however, that the decision to delay Dostaler's August 18, 2014 reprimand from the morning to the end of Dostaler's shift was negligent or reckless. Disciplining an employee immediately before he is scheduled the leave the office is often desirable not only because it provides the disciplined employee the opportunity to lick his wounds in private, but also

because it prevents the employee from immediately retaliating against any complainant, or from otherwise disrupting the workplace.  While a reasonable jury could conclude that Dostaler had a propensity to harass the plaintiff or that it was likely he would do so, the evidence does not suggest that Dostaler's harassment was a daily occurrence or that waiting several hours to discipline Dostaler would lead to Plaintiff's assault.

Defendant argues that Plaintiff's negligent supervision claim is barred by the Worker's Compensation Act's exclusivity statute, Conn. Gen. Stat. § 31-284(a), which provides that an employer "shall not be liable for any action for damages on account of personal injury sustained by an employee arising out of and in the course of his employment."  In support of this position, Defendant cites *Driscoll v. General Nutrition Corp.*, 252 Conn. 215, 216 (2000), which held that being forced to perform fellatio in the workplace was a "physical injury," and that an action for emotional distress arising out of such an assault was barred by the exclusivity statute.  However, subsequent decisions in this district have limited the reach of *Driscoll*, and have permitted actions for damages where the physical touching involved was not as "invasive" or where it was unclear whether the damages arose from physical conduct, verbal harassment, or a combination of the two.  *See Roberts v. Circuit-Wise, Inc.*, 142 F. Supp. 2d 211, 215 (D. Conn. 2001); *Abate*, 130 F. Supp. 2d at 345-46.  Here, Plaintiff alleges both physical and verbal harassment, and material issues of fact preclude summary judgment on the question both of whether Plaintiff is entitled to any damages, and from which actions these damages arose.

Defendant also argues that the Plaintiff cannot recover damages for negligent supervision, because she has not offered evidence that she suffered any economic damages, and "Connecticut bars all negligence-based emotional distress claims occurring within a continuing employment context," *Antonopoulos v. Zitnay*, 360 F. Supp. 2d 420, 431 (D. Conn. 2005). While Plaintiff agrees that emotional distress damages are unavailable in a negligent supervision case in a continuing employment context, she argues that (1) her emotional distress arose during the course of her termination; and (2) that she is entitled to economic damages.

The Court disagrees that that the alleged negligent supervision was in any way related to Plaintiff's separation from Utitec. While the exact timing of Plaintiff's formal separation is in dispute, Defendants have offered unrebutted evidence that Plaintiff was welcome to return to work at numerous times during her extended medical leave.

Material issues of fact prevent the Court from holding as a matter of law that the Plaintiff is not entitled to economic damages. Plaintiff has offered evidence that she began to take extended leave from work in the fall of 2014, or shortly after Plaintiff alleges that Dostaler began harassing her. The causes of this leave, whether fear of continuing harassment by Dostaler in the office, worsening medical conditions due to harassment-related stress, or pre-existing medical issues unrelated to Plaintiff's claims, are best left to the jury. While the economic damages at issue here may have resulted from emotional distress, at least one decision issued since *Antonopoulos* has cautioned against applying the

bar on recovery for emotional distress too broadly in negligent supervision cases. *See Molina v. Eagle Leasing Co.*, No. 3:13-CV-00413-WWE, 2014 WL 3864879, at *3 (D. Conn. Aug. 6, 2014). *Molina* refused to dismiss a complaint for negligent supervision where the plaintiff asserted "severe financial harm, physical harm and jeopardy, and loss of employment in addition to emotional injuries." *See id.* As Plaintiff has offered evidence of economic damages from lost wages, and genuine issues of fact remain regarding why Plaintiff stopped going to work, summary judgment is inappropriate.

V.    <u>Conclusion</u>

For the foregoing reasons, the parties' cross-motions for summary judgment are DENIED.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut:  September 28, 2017